UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHIRAG SACHDEVA | Criminal Case No. 20-CR-73-JJM |

### **GOVERNMENT'S SENTENCING MEMORANDUM**

From abroad, Defendant used his skills and education to steal from elderly individuals residing in the United States.  Through involvement in telemarketing fraud between 2015 and 2019, Defendant obtained personal information about a series of people who had previously fallen prey to Tech Fraud.  That information included names, dates of birth, social security numbers, home addresses, driver's license photographs and numbers, bank names, and online-banking usernames and passwords.  In the fall of 2019, Defendant tried to re-victimize the group by using the banking information he had obtained to steal money from the victims' bank accounts.

Starting in 2015, Defendant engaged in Tech Fraud or Tech Support Fraud, a form of telemarketing fraud where victims are falsely told that malware has been detected on their computers, and then the lie is leveraged to sell the victims purported computer protection services.  It is generally call center operators (often from centers based in India) who mislead the victims into believing that their computers have been compromised.  It is generally those same call center operators who "sell" the victims purported services to fix their non-existent, fictitious computers-virus troubles.

Typically, the scam begins with pop-up advertising appearing on their victims' computers.  Those ads warn – without basis – of virus troubles and urge the computer users to call for help.  The calls link the victims to the call center operators who reiterated – without basis – that the victims' computers have been infected.  The operators then collected information from the victims and – through remote access software – from the victims' computers.

Defendant was a middleman in this fraud process.  Through use of certain call-routing technologies and connection to parties who generated pop-up calls (known in telemarketing fraud circles as "publishers"), Defendant was able to generate a stream of calls from victims and sold that stream to call centers.  Through these connections with call centers and others involved in Tech Fraud, Defendant was able to collect information – the aforementioned personal information – about people who had fallen prey to Tech Fraud and other associated scams, including information that had been collected by the call center operators.  Defendant had access to a computer on which this personal information had been compiled and stored.

By September 6, 2019, Defendant was no longer working in the Tech Fraud space.  His previous associates – call center owners and others – had told him that they were no longer involved in Tech Fraud, and Defendant lost a stream of revenue.  On September 6, 2019, Defendant reached out to an acquaintance and in conversation suggested to him that he, Defendant, had data – that had been obtained from or about victims of Tech Fraud and associated scams – and that that data could be used to get more from Tech Fraud victims.  In particular, Defendant indicated that the data, with the acquaintance's assistance, could be used to misappropriate money from the victims' bank accounts.  Shortly thereafter, the acquaintance received two spreadsheets containing a total of 47 names of people along with addresses and telephone numbers.  Then the acquaintance received photographs of 30 checks, which included the account holders' names, addresses, bank names, account numbers, and routing numbers.  In a subsequent telephone call, the acquaintance advised Defendant that nothing could be done with the information he had shared.

Undeterred, on September 30, 2019, Defendant advised the acquaintance that he, Defendant, was able to obtain additional data that could better accomplish the intended misappropriation.  Defendant and the acquaintance agreed to divide any misappropriated funds fifty-fifty.  Subsequently Defendant started providing the

2

acquaintance more information as follows:

- On October 21, 2019, Defendant provided the acquaintance information about Victim SM, information sufficient to enable the withdrawal of money from SM's bank account with Chase Bank. Defendant indicated that there was $8,000 to $10,000 in the account to be taken.

- On October 30, 2019, Defendant provided the acquaintance information about Victim CP, information sufficient to enable the withdrawal of money from CP's account with Wells Fargo. Defendant indicated that there was $10,000 in the account to be taken.

- On November 6, 2019, Defendant provided the acquaintance information about Victim CW, information sufficient to enable the withdrawal of money from CW's account with Fidelity. Defendant indicated that there was $80,000 in the account to be taken.

- On November 6, 2019, Defendant provided the acquaintance information about Victim RN, information sufficient to enable the withdrawal of money from RN's account with Nusenda Credit Union. Defendant did not indicated how much was in the account.

- On November 6, 2019, Defendant provided the acquaintance information about Victim PP, information sufficient to enable the withdrawal of money from PP's account with a credit union. Defendant did not indicated how much was in the account.

- On November 26, 2019, Defendant provided the acquaintance information about Victim RT, information sufficient to enable the withdrawal of money from RT's account with USAA Bank. Defendant indicated that there was $350,000 in the account to be taken.

- On November 26, 2019, Defendant provided the acquaintance information about Victim RG, information sufficient to enable the withdrawal of money from RG's account with USAA Bank. Defendant indicated that there was $150,000 in the account to be taken.

The information provided would have allowed the acquaintance, via online banking, to withdraw money from the victims' accounts and direct them to other accounts in the United States. From those other accounts, the money could have been withdrawn or directed to other accounts for withdrawal in the United States or abroad. Such movement of money is common among those involved in moving telemarketing fraud funds.

The acquaintance, at the Government's direction, did not actually remove any

money from the victims' accounts, but he easily could have, and Defendant wanted him to.  Because the acquaintance's activities were controlled by the Government, loss for these victims was avoided.  Because the Government was able to utilize the acquaintance and prevent Defendant from working with an intermediary not controlled by the Government, colossal loss for these victims was avoided.

Each of the aforementioned victims have been verified to be elderly individuals living in various parts of the United States.  It has been verified that each of these victims had earlier fallen prey to Tech Fraud or some other form of fraud and had either divulged personal banking information or had had such information taken from their computers.  The victims' losses from prior victimizations were as follows:

- SM lost $149 to Tech Fraud,
- CP lost at least $500 to Tech Fraud or some other form of telemarketing fraud,
- CW lost $349 to Tech Fraud,
- RN lost to Tech Fraud, but was able to recover, approximately $1,700,
- PP lost to Tech Fraud, but was able to recover, approximately $2,874,
- RT lost $800 to Tech Fraud, and
- RG lost $800 to Tech Fraud.

When Defendant sought to misappropriate the money from their bank accounts, the victims were all in their retirement years.  SM, a 67 year-old, resided in Texas.  CP, a 69 year-old, resided in Pennsylvania.  CW, an 89 year-old, resided in Florida.  RN, an 87 year-old, resided in New Mexico.  PP, a 74-year old, resided in Virginia.  RT, a 73 year-old, resided in Texas.  RG, a 67-year, resided in Texas.  Defendant knew, or suspected, that all of these victims were elderly.  Defendant knew – certainly must have known – the sense of intrusion and harm the victims of his conduct would have felt, and that sense of intrusion and vulnerability certainly existed even for those who lost nothing.

Those who are engaged in telemarketing fraud and associated frauds and misappropriations often act from outside the United States.  Defendant's telemarketing fraud activities were conducted from India.  Defendant's collection of victim data was

done while he was in India.  Had Defendant not traveled to the United States, bringing him to justice would have been difficult.

Considering the gravity of Defendant's conduct and the harm intended and achieved – while also considering Defendant's personal situation and the time sufficient but not greater than necessary to achieves the purposes of sentenced – the Government recommends a term of imprisonment at the lowest point of the applicable Guidelines range:  33 months.  Such a sentence addresses the effort to target our elderly.  Such a sentence signals the seriousness of the offense to Defendant, others engaged in such conduct, and foreign officials.  Such a sentence also provides deterrence and encouragement to others elsewhere to treat this sort of misconduct seriously.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorney,

AARON L. WEISMAN
United States Attorney

/s/ Milind Shah
Milind Shah
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  milind.shah@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of November 2020, I filed the above sentencing memorandum using the Court's electronic filing system and thereby made the memorandum electronically available to Defendant's Counsel, John L. Calcagni.


<u>/s/ Milind Shah</u>
Milind Shah
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  milind.shah@usdoj.gov