IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * * * *   C.R. NO. 20-73-JJM
                                  *
UNITED STATES OF AMERICA          *
                                  *
    VS.                           *   NOVEMBER 6, 2020
                                  *   9:00 A.M.
CHIRAG SACHDEVA                   *
                                  *
* * * * * * * * * * * * * * * *   VIA VIDEOCONFERENCE


BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

CHIEF JUDGE


(Sentencing)


APPEARANCES:

FOR THE GOVERNMENT:    MILIND M. SHAH, AUSA
                       U.S. Attorney's Office
                       50 Kennedy Plaza
                       Providence, RI  02903

FOR THE DEFENDANT:     JOHN L. CALCAGNI, III, ESQ.
                       Law Office of John L. Calcagni III
                       72 Clifford Street, Suite 300
                       Providence, RI  02903

Court Reporter:        Karen M. Wischnowsky, RPR-RMR-CRR
                       One Exchange Terrace
                       Providence, RI  02903

6 NOVEMBER 2020 -- 9:00 A.M.

VIA VIDEOCONFERENCE

THE COURT:  Good morning, everyone.  We're here this morning in the case of the United States versus Chirag Sachdeva, Criminal Action 20-73.

Would counsel identify themselves for the record, please.

MR. SHAH:  Good morning, your Honor.  Milind Shah for the United States.

THE COURT:  Good morning, Mr. Shah.

MR. CALCAGNI:  Good morning, your Honor.  John Calcagni for Mr. Sachdeva.

THE COURT:  Good morning, Mr. Calcagni.

Good morning, Mr. Sachdeva.

THE DEFENDANT:  Good morning, your Honor.

THE COURT:  Mr. Sachdeva, we're conducting this sentencing via Zoom.  The Court has determined that it's not -- the Court's determined that it's not safe for people to enter the public building because of the pandemic into the courthouse; and so we're offering to conduct this and other criminal procedures, all criminal procedures, via Zoom remotely.

You have a right to be present for your sentencing, but my understanding from your attorney is that you wish to waive your right to be present for

this sentencing.  Is that true?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  And did you discuss that with your attorney?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And, Mr. Calcagni, are you in agreement that it's in Mr. Sachdeva's best interest to conduct this via remote and that he's voluntarily and knowingly waiving any right he has to appear in person?

MR. CALCAGNI:  Yes, your Honor.

THE COURT:  Okay.  Great.  So how we'll proceed this morning is we'll calculate the advisory guideline range.  I'll see if there are any objections to it. Then the Government will make its sentencing recommendation.

Mr. Shah, is there a victim that wishes to speak?

MR. SHAH:  There is a Mr. Gibbo who has been given the public number, but this morning we have not been able to get in contact with him.  So I'm not quite certain, your Honor, whether he will be attending.

THE COURT:  Is Mr. Gibbo on the Zoom hearing now?  If so, could you unmute yourself and speak.

(Pause)

THE COURT:  Okay.  Vickie, if somebody -- oh,

someone's in the waiting room now.  Is Mr. Gibbo a Rhode Islander, Mr. Shah?

MR. SHAH:  He is not a Rhode Islander, your Honor.

THE COURT:  Okay.  Because someone with a Rhode Island number --

THE CLERK:  They're in the meeting, Judge.

THE COURT:  Oh, okay.  Mine still shows that he was there.  Okay.  Vickie, if someone comes in, you can flag us and let me know.

THE CLERK:  Okay.

THE COURT:  If anyone additional does.

So Mr. Shah will make his sentencing recommendation.  Then Mr. Calcagni will make his sentencing recommendation.  Then, Mr. Sachdeva, if you want to speak, you'll be allowed to speak, and then I'll get on with the sentence.  Okay?

THE DEFENDANT:  Okay, your Honor.

THE COURT:  Okay.  I've also received memos and attachments and letters from both the Government and from Mr. Calcagni.  I have read all of them and considered all of them as well.

So with that, the guideline range is calculated as follows:  The base offense level here for the wire fraud conviction is seven.  There's 14 points added

because the amount of loss -- intended loss in this case is $600,000, which falls in between $550,000 and $1.5 million.  So that's a 14-point addition.

There's two points added because a substantial part of the fraudulent scheme here was committed outside the United States, in this case in India, for an adjusted offense level of 23.

There's a two-point reduction for acceptance of responsibility, and I understand the Government wishes to make a motion on the third point, Mr. Shah.

MR. SHAH:  I so move, your Honor.

THE COURT:  Great.  That will be granted for a total offense level of 20.  Mr. Sachdeva has no criminal history, therefore is a Criminal History Category I.  So a total offense level of 20, Criminal History Category I, comes with a recommended period of incarceration of 33 to 41 months.

Mr. Shah, any objection by the Government to the guideline range or to the PSR?

THE DEFENDANT:  No objection, your Honor.

THE COURT:  Thank you.  Mr. Calcagni, same question.

MR. CALCAGNI:  There are no objections, your Honor.

THE COURT:  Great.  Thanks.  I'll hear from the

Government.

MR. SHAH:  Your Honor, I'd like to start out by discussing the fairly complicated fraud afoot, and there are two terms that appear in my sentencing memo and two terms that I expect will appear or be heard as I speak now.  They are "tech fraud" and "refund fraud."

Let me start off generally by explaining what they are, and then I will go into what the evidence in this investigation establishes as Mr. Sachdeva's role in all of this.

Tech fraud, quite simply, is a process by which a person, a computer user, is led to believe that his or her computer is infected with a virus.  That false belief is then leveraged to sell the person putative computer protection services.

Typically the way this works is pop-up ads, or typically the way it's experienced by a victim is that as they are surfing the internet, a pop-up ad shows up on their computer.  The pop-up ad has words to the effect of there is a virus on your computer or malware is attacking your computer, call the following phone number.

And sometimes these pop-up ads say things like this message is from Microsoft or other indicators that would lead someone to think that, at least someone

who's not computer savvy, to think that this is a bona fide indication of a problem with the computer.

For those who call, the call is routed to a call center in India.  An operator on the line at the call center will advise we understand, or words to the effect of we understand that your computer has been infected by a virus.

There's no basis for this claim.  The pop-up ad simply shows up on the computer because it's embedded in certain websites or targeted to websites that various people tend to go to.

There is at no point in this process any examination of the computer to determine whether there's a virus on it.  The ad is simply a posting, like a newspaper ad, that pops up on someone's screen.

The computer operator also has no basis for saying that the computer has a virus but, knowing that the call was inbound based on a pop-up ad, follows through on the pop-up ad saying we have information or words to the effect of we have information that your computer has been infected by a virus.

The operator then sells the user, computer user, a computer protection package, usually which is nothing more than an opportunity to telephone back and discuss any problems that are being experienced on the

computer.

In the course of all this, the operator tries to get remote access to the user's computer.  And remote access, your Honor, is often achieved through various pieces of software available on the internet or through various websites.

The operator would instruct the computer user to go to a certain website and at that website click on a hyperlink.  That hyperlink would contain a series of instructions, and those instructions would provide that operator at the call center remote access to the computer of the user.  The operator can use that access to collect information from the user's computer.

At some point the user is asked to either wire transfer money to the operator or through some other means send the operator money.

There's a follow-up piece to this sort of scam. It is called refund fraud.  This would be where people who have purchased what they thought was computer protection services would get a call from a call center operator saying words to the effect of our computer protection service company is going out of business. We need to issue you a refund.  Let me do one last computer virus check on your computer.  Please provide me remote access by going to the following website.

The user again goes, provides remote access. The call center operator uses that remote access to collect information off the person's computer, and at some point the operator would lead the victim to believe that money will be returned.  You paid $1,000 for computer protection services.  We're going to refund that because we're going out of business.

The call center operator would then manipulate the remote access to display on the user's screen a page indicating that more than $1,000 had been deposited into the computer user's bank account.

So, for example, if the refund was supposed to be a thousand, what might appear on the computer is that $50,000 has been refunded to the user.

The call center operator would then leverage this supposed overage and seek for the computer user to return $40,000 to the call center operator.

Now, no money has been transacted at this point, so this is pure fiction that any money has been deposited into the computer user's account; but the computer user is persuaded to believe that money has been deposited into their account.  They're provided information, wire instructions, to send money to a particular account.

During the course of either of these frauds, and

one is a tagalong to the other, the call center operator has an opportunity to collect all kinds of personal information about the computer user from the computer user's computer.

In this particular case, Mr. Sachdeva served as what's known in this industry as a middleman.  To explain what a middleman is, I need to explain a little bit about the technology involved in the call routing.

When a person gets a pop-up ad, that pop-up ad contains a 1-800 number.  That 1-800 number routes to a computer platform or software platform that collects calls, that accepts a stream of calls to this 800 number and then distributes out the calls to call centers.

This platform allows middlemen to buy call streams and then sell them to call centers. Mr. Sachdeva was such a middleman.  He was primarily, from the evidence gathered in this investigation, associated with one call center.

He would accept streams of calls, paying the parties that were posting these pop-up ads some amount of money to purchase the stream of calls, and then collecting some amount of money from the call center to distribute the stream to the call center.

As set forth in the sentencing memo, there was

an extended period of time where Mr. Sachdeva was involved in this sort of tech fraud activity.  There came a time where his partners in the tech fraud world told him that they were no longer involved in tech fraud.

Mr. Sachdeva at this point no longer had a stream of income coming from tech fraud, but he did have access to some of the information collected by the call center operators.  This information included people's names, addresses, driver's license pictures, driver's license numbers, bank account information, including online banking usernames and passwords; and Mr. Sachdeva's idea at this point was to use this information to replace his lost stream of income.

He attempted to do so by calling an acquaintance of his, an acquaintance with whom he had engaged in tech fraud activities when he was able.  That acquaintance, unbeknownst to Mr. Sachdeva, was working with the Government and was located in Rhode Island at the time of Mr. Sachdeva's reaching out to him.

Mr. Sachdeva reached out to him, initially providing some information, mostly a spreadsheet of victims of tech fraud and also check numbers and signed checks.  One of the ways tech fraud can collect money is the person who is the victim writes a check and

mails it.

It appears from the information Mr. Sachdeva had that one or more of the call centers he was working with was collecting payment through checks. Mr. Sachdeva provided that information to the acquaintance, and the acquaintance indicated nothing could be done with that.

Mere account numbers, routing information, basically a photocopy of a check is insufficient for any fraud according to this acquaintance, and Mr. Sachdeva was advised of this.

That wasn't the end. Mr. Sachdeva reached back out, and he provided more detailed information, and that more detailed information pertained to seven different victims. The victims are acronymed as SM, CP, CW, RN, PP, RT and RG.

Mr. Sachdeva provided very specifically name, address, driver's license image, driver's license number, bank account number, bank name, online password as well as username, essentially all the information one needs to log on to a person's bank account online and use whatever functionalities the bank has available to manipulate or shift or transfer money from bank accounts.

The FBI's investigation indicated that all of

the websites associated with the banks at issue here had functionalities that would allow wire transfers or that would allow for the money to be sent to other accounts in one form or another.

Some banks refer to these as wire transfers, some banks refer to this as online checks; but they are basically functionalities that allow you, once you are logged in to your online banking interface, to transfer money out of your account to other places to make payments to others.

Those functionalities could be used to withdraw money.  Usually it's the owner of the account who's doing this, but Mr. Sachdeva provided information to the acquaintance for the purpose of that acquaintance going in and transferring the money without the accountholder's permission.

Basically this was a theft scheme.  It was a scheme to take money -- sorry, your Honor.  It was a scheme to take money out of these victims' accounts, and the deal was that the accomplice would keep -- excuse me, the acquaintance would keep 50 percent of the money and Mr. Sachdeva would keep 50 percent of the money.

All of these victims are elderly.  They are spread across the United States.  It's specified in the

plea agreement that Mr. Sachdeva knew or had strong reason to understand that all of these victims are elderly.  Let me unpack that a little bit.

THE COURT:  Can I just ask you, Mr. Shah, I saw that reference in there.  I was surprised that the guidelines didn't have an add-in for vulnerable victims.

MR. SHAH:  Your Honor, it's my understanding that the case law related to vulnerable victim --

THE COURT:  Elderly alone is not sufficient?

MR. SHAH:  Correct.

THE COURT:  Got it.

MR. SHAH:  Elderly alone is not sufficient, but let me unpack a little bit for why one may have strong reason to suspect or even know that these victims would be elderly.

Typically the people who fall prey to tech fraud are older people, people with less computer sophistication, people with a lack of familiarity with computers, people who have memory and cognitive decline issues.  These all make older people more likely prey to tech fraud than younger people or middle-age people.

Now, the vulnerable victim enhancement has not been sought here because the Government does not have in its possession information indicating that any of

the named victims or any of the known victims in this case have cognitive decline or that Mr. Sachdeva understood that they have cognitive decline.

I'm not arguing under the enhancement. However, targeting elderly people for fraud, people who are in their retirement years, people who have fixed incomes, people who will be left bereft by this sort of intrusion in a particular way, it suggests a gravity to this offense that's different from a fraud scheme like this that targets the public in general and that hits on the public in general.

Mr. Sachdeva's goal here was to collect some or as much money as possible from each of these victims. He logged into their accounts or in some other manner got access to their accounts so that he could advise his associate, the one who lives in Rhode Island, how much money was there for the taking in these accounts.

So, for example, with SM's account, SM, who is a retired Navy veteran who lives in Texas, he's a retired VP from a medical devices company, his account contained somewhere between eight and ten thousand dollars, according to Mr. Sachdeva.

More concerning even still was the communication relating to RT's account. Now, RT had a USAA bank account that also suggests that he's a veteran or a

family member of a veteran.  His account, Mr. Sachdeva said, had $350,000 in it.  Now, Mr. Sachdeva's intention here, your Honor, was to get as much of this money as he could.

No actual money was taken from these accounts. That is a point that I think defense counsel will agree to.  This was a pure intent scam; but its gravity is still great because if the accomplice, the associate who was working for the Government, were not available to Mr. Sachdeva, ordinary reason suggests that he would have searched around for somebody else.

The only reason these people were not subjected to even greater risk is because the conduit for the fraud, Mr. Sachdeva's associate who unbeknownst to him was working for the Government, the only reason these people weren't subjected to even greater risk is because the Government was able to step in with a conduit that it was able to control.

I'd suggest that to the Court because ordinarily it's not merely intended loss that matters in the Court's consideration or in common sense consideration of the gravity of a crime, it's how much was actually lost.

Well, another factor to consider here, even though there was no actual money lost, the intention

was to revictimize a slew of people who had previously been victimized by tech fraud in far lesser amounts, to use the information collected during the course of those efforts at fraud or successful efforts at fraud, I should say, and to weaponize that information to get even more money from these people.

Your Honor, there are various aspects of Mr. Sachdeva's particular situation.  Well, they're a basis for some level of pity at a minimum.  His financial situation is not great.  He has, himself, been the victim of crime.

The issue is that none of that context aside from his debt as a reason for wanting to go out and cheat people for money, none of those other factors which may lend grounds for sympathy for Mr. Sachdeva are associated with this crime.

His victimization at the hands of another doesn't really connect up or explain motivation or help understand why or in any sense mitigate this behavior and targeting of elderly people in the United States for further scamming.

I've mentioned in my sentencing memo one other particular feature -- I'm sorry I'm going on so long, your Honor.  I'm close to the end.

One other aspect of this case that's different

from the run-of-the-mill fraud case that comes before the Court is we're talking about extraterritorial conduct.  In other words --

THE COURT:  Mr. Shah, can you explain the Rhode Island -- I don't fully understand the Rhode Island connection and how Mr. Sachdeva is here.

MR. SHAH:  So Mr. Sachdeva is here because the associate he reached out to to effectuate his fraud was here in Rhode Island for the entirety of what's set forth in the Information.

So jurisdiction, as the Government understands it, can be a function either of victims being here or, in unusual cases like this where there are victims spread all across the country, where some part of the scam conduct touched on Rhode Island.

THE COURT:  I wasn't concerned about jurisdiction.  That seemed obvious to me.  I'm just curious.  Did Mr. Sachdeva come here to further conspire with his associate in person?

MR. SHAH:  Yes.  So there was a cooperator used in this investigation.  I hesitate to call him a conspirator since he is a Government agent; but this cooperator at some point after we had developed this evidence that's set forth in the Information and after we had made sure that these people were not victimized

in the manner that Mr. Sachdeva sought and after we'd reached out to them and saw to it that they had changed their bank account numbers and their banks had set up safeguards for them, Mr. Sachdeva was invited by the cooperator to come to the United States to help the cooperator grow his fictitious telemarketing fraud activities here in the United States.  Mr. Sachdeva flew here.

THE COURT:  Got it.

MR. SHAH:  He flew here in January, and upon arrival he was arrested at the airport or soon upon arrival.  That's how we ended up here.

The reason I bring this up is not to -- to be clear is not to pick on any nation or any people or any group of people.  The issue is simply that the United States' ability to police this kind of conduct is different in kind.

Namely, when the Government is policing and making safe its citizens or residents for conduct conducted by people in the United States, there's an extra measure of power and ability that the Government has through investigative tools, through the fact that the person is here.

When the investigation involves somebody who's abroad, the investigation itself is much more

difficult, but additionally the power to police this kind of conduct long term is a little more difficult.

I mention this because I would suggest to the Court that deterrence plays a greater role here because it provides a signal to this particular Defendant, his circle and circles of telemarketing fraudsters in India, but it also provides a signal to the Indian government as to the seriousness with which we take these types of fraud offenses.

I'm not suggesting, nor do I believe, that in the sum balance of the information before the Court that anything more than the low end of the guideline range is appropriate.

Mr. Sachdeva fairly quickly admitted to his offenses upon being caught.  Much of what I've set forth to the Court now was relayed to Government agents during the course of the investigation through Mr. Sachdeva's communications with the cooperator or by Mr. Sachdeva himself when he spoke to agents following his arrest and advisement of his rights.

Your Honor, I've gone on at some length in part because this is the first of a series of telemarketing fraud cases.  This is an unusual type of scam, at least in our district, unusual in that people have been caught, not unusual in that people have been scammed;

but I went on at length because this is the first that I've put before the Court.

THE COURT:  Thank you, Mr. Shah.  I appreciate it.

Mr. Calcagni.

MR. CALCAGNI:  Good morning, your Honor.  Thank you.  Your Honor, the defense is recommending to the Court a sentence of one year and one day as set forth in my written submission.

I wish to emphasize to the Court a few things about my client.  First and foremost, you already know he's relatively young.  He's age 30, and he has no criminal record.

Mr. Shah just pointed out that my client quickly accepted responsibility for his actions; and as Mr. Shah just acknowledged and as my pleadings remind the Court, that at the time of his arrest, Mr. Sachdeva was very cooperative and did what he could to meet with investigators and to mitigate his misconduct and perhaps misconduct of others.

And I know this isn't a situation where the Government has moved to a 5K credit; but nonetheless it's something I think the Court needs to take into consideration when evaluating the value that should be placed on this particular Defendant's acceptance of

responsibility.

Mr. Shah also indicated in this case that there was no actual loss.  And I think that's important to mention again because in my submission, I had misstated that the actual loss amount was $23,000.

And those were facts and circumstances that were derived from the criminal complaint that was initially filed with the Court in this matter.

Because Mr. Sachdeva pleaded guilty pursuant to a criminal Information that was filed, this wasn't an instance where he had been indicted and that there was a great deal of formal discovery.

THE COURT:  Mr. Calcagni, can I interrupt you for a second?

MR. CALCAGNI:  Certainly.

THE COURT:  I probably should have asked Mr. Shah this and then I forgot.  Is there any request for restitution?

MR. CALCAGNI:  Not that I'm aware of as related to his actual misconduct.

MR. SHAH:  Your Honor -- I'm sorry, Mr. Calcagni, to interrupt if I may just one moment. What's set forth in the Government's sentencing memo relates to fairly small amounts suffered as tech fraud losses.  They are on page 4.

THE COURT:  Right.  I've calculated it at $4,422.  Is that the amount that the Government is requesting for restitution?

MR. SHAH:  Yes, your Honor.

THE COURT:  Okay.  Great.

MR. SHAH:  My apologies.

THE COURT:  That's okay.  Thanks.

Go ahead, Mr. Calcagni.

MR. CALCAGNI:  And, your Honor, I suppose the Court is going to have to decide as to whether or not it wants to order that restitution.  And the reason I suggest that is because Mr. Sachdeva is not before the Court for being a participant in the tech fraud scheme from which the Government theorizes he obtained the personal identifying information.

So the Court's going to have to determine if you're going to impose upon him the restitution for this amount that presumably others financially gained through actually conducting the fraud from these so-called call centers.  So I'm not going to offer much more on that point, but I simply offer that to you.

Another point that I'd really like to drive home here is the difficulties that my client has undergone since he's been at the Wyatt.

Now, your Honor's read the presentence report as

well as my submissions, and you know that I have emphasized that this gentleman has a mental health history.

Ms. Edgar references in the presentence report that she was unable to get any records from the Wyatt on this, and this is not something that she and I spent any time working on together through the presentence investigation process; but lo and behold, I happen to have a stack of my client's Wyatt medical records here at the office that I did provide to her this morning.

And for what it's worth, those records do substantiate the medications that he's been on since at the Wyatt and the adjustments that have been made to them.  Those records do substantiate the suicidal ideations and the diagnosis of major depressive disorder, and those records do substantiate him having been victimized of a kidnapping and a sexual assault in the past.

Now, of course Mr. Shah raises a great point that that really doesn't serve as a justification here, and I'm not suggesting it does; but I wanted the Court to know that there is corroboration of those remarks that were set forth in my pleading in addition to my own personal knowledge because if you look at the docket in the case, you'll note that I got involved in

this case during the midst of the pandemic.

There's not much excuse or justification that anybody can offer to the Court for Mr. Sachdeva's actions; but from what I understand when speaking with Mr. Shah, this so-called fraud type that's been discussed here today is essentially a bustling industry in India.

The Court knows that India is a country where the people are quite polarized.  You have a minority that are extremely wealthy and a large majority that are extremely poor; and my guess is from speaking to my client and the research I've done and conversations with Mr. Shah, that though this conduct is completely illegal and unjustifiable, it might simply be a way of life for people in that country to survive.  And I'd suggest to the Court that that's how my client got roped into this.

Your Honor, it's never easy to sort of calculate what an appropriate sentence should be in any case. Some judges just look to the guidelines and don't give much more thought to it.  Other judges, like yourself, are much more analytical.

As you know, one of the 3553 considerations is to avoid the imposition of unwarranted sentencing disparities.  And as I reflect on that particular

factor, my own memory is drawn to a case that you and I worked on back in June of this year.

It's not an identical fraud case, but it's a credit card fraud case. The Defendant's name was Juan Rodriguez Castro. This was a matter that I brought before you on a motion to suppress and then ultimately a change of plea hearing where the Defendant was involved in significant credit card fraud.

That Defendant, like my client, was not a U.S. citizen. He was a Dominican Republic national. That Defendant's conduct resulted in actual losses and a restitution amount of $1.28 million. That Defendant's sentencing guidelines were 63 to 78 months, nearly more than double Mr. Sachdeva's.

And in that case the Government requested a sentence of 70 months, and your Honor sentenced the Defendant to 41 months, which was significantly below the guidelines.

So I'm bringing that to your particular attention. That Defendant didn't have the personal history of Mr. Sachdeva, hadn't been victimized, didn't come from a background of poverty, actually stole significant sums of money for which he was held accountable on the restitution.

And I'd just offer that to you as potentially a

guidepost as you deliberate on the sentencing recommendations offered between myself, the year and a day, and then Mr. Shah at 33 months.

THE COURT:  Thank you, Mr. Calcagni.  I appreciate that.

Mr. Sachdeva, do you wish to say anything before I impose sentence?

THE DEFENDANT:  I am sorry for what has happened.  I'm deeply sorry.

THE COURT:  Thank you.

THE DEFENDANT:  And it won't happen again.

THE COURT:  Thank you, Mr. Sachdeva.  When the Court is required to impose sentence after a conviction for a crime, the Court has to look at both the crime and the person, that is, the seriousness of the crime and the history and characteristics of the person that appears before me.

Preying on anyone economically but certainly preying on elderly or other people who may technically not be vulnerable as the Court sees as vulnerable is a serious, serious crime.

It's not stealing from a bank, not that that's right.  It's not stealing from rich people.  It's stealing from victims who can least afford it, but the -- from reading the victims' letters and my

understanding is the victimization of those people continues because they distrust their government, they distrust institutions, they distrust going forward that's rather permanent and is severe. And so they may have lost money, but they lost a lot in terms of personal security and confidence.

And I cannot conceive of why someone in your position in life with all the benefits that you've been given in life, Mr. Sachdeva, would engage in this kind of conspiracy to defraud people. It's incomprehensible to me. These kind of frauds to me are evil in a real way, and they go unexplained.

And then I look at you. And, sure, you had some severe difficulties with a father who was violent, with your own sexual assault and kidnapping, but you had a mother and a sister that loved you. You've clearly got a wife that loved you. You're college educated. You had the wherewithal to start some businesses. Whether they continued or not was one thing.

And instead, for reasons that I can't explain at all, Mr. Sachdeva, you went the route of fraud. It doesn't make any sense to me except for the fact that there had to have been something that -- missing in your head that allowed you to go the route of fraud instead of all the other routes that you had available

to you.

I don't understand that.  I think Mr. Shah actually said it right when he said that there really is no explanation for what happened here.  And when you look at why do we punish people, why do we sentence people, we sentence them to punish them.  We sentence them to deter them so that they don't do it again.

We punish people to send a message to the public so that they're deterred.  We sentence for rehabilitation purposes.  We sentence for justice so that justice to the victims occur.

And all of that, I tried mightily, I think probation and others can attest to this, to come up with some logic or reasoning or rationale as to why I should go below the guideline range, and I can come up with none.  I cannot find an explanation that would support a below-guideline-range sentence here.

I believe that the guidelines are what we're required to and do turn to in the first instance, and then we go from there, and I begin and end at the guideline range here.  I find nothing more.

It is important that we deter you from ever doing this again, someone who had so much going for him and chose to go the fraud route.  It's equally important that we send a message to the vast number of

people that are committing this fraud that we take this seriously as a society and that it will be punished severely.

So the Court has determined that the guideline range is actually appropriate.  Oftentimes I have my hands tied where I'm forced to send people that deal in drugs to five years and seven years and eight years and ten years; and here, for someone that was committing this kind of long-standing, complicated fraud, the guideline range of 33, I think the guidelines themselves give you a level of unintended leniency, to be honest with you.

I find the guidelines are appropriate and the guidelines meet all of the 3553 factors.  Therefore, the Court's going to impose a period of 33 months of incarceration --

THE DEFENDANT:  Judge, I want to say something.

THE COURT:  No, sir.  Without any -- with three years of supervised release.

(Overlapping speech)

THE COURT:  Sir, please, you've had your chance. I need to get through this.  The Court will impose restitution in the amount of $4,422.  A fine is not appropriate given the amount of restitution.  The Court will impose the $700 special assessment.  The 33 months

is as to each count but to be run concurrently, and that is for a total of 33 months.

In addition to the standard conditions -- the Court is only imposing the standard conditions of supervised release in light of the fact that you're likely to be deported after this.

Mr. Sachdeva, you have a right to appeal the sentence that the Court imposed. If you do want to appeal the sentence, you can proceed without the payment of fines if you request the Court to allow you to proceed in forma pauperis, that is, without the payment of fines -- the payment of fees.

The Court will also allow -- will appoint counsel for you to file the appeal and effectuate the appeal. You simply need to request that. And the Clerk of Court would assist you in any way in filing an appeal.

The most important thing for you to understand is that any appeal from this sentence has to be accomplished within 14 days of the entry of judgment on the record.

Did he waive his appeal right, Mr. Shah?

MR. SHAH: Your Honor, paragraph 12 of the plea agreement includes an appellate waiver.

THE COURT: I apologize. So, Mr. Sachdeva,

you've waived your right in most circumstances to appeal the sentence that I imposed.  I apologize.  I had forgotten that there was the plea agreement.  I think that's it.

Ms. Edgar, anything further for probation?

THE PROBATION OFFICER:  No, your Honor, I do not believe so.

THE COURT:  Thank you.  Mr. Shah, anything further for the Government?

MR. SHAH:  No.  Thank you, your Honor.

THE COURT:  Mr. Calcagni, anything further for Mr. Sachdeva?

MR. CALCAGNI:  No.

THE COURT:  Mr. Sachdeva, I know this is a disturbing bit of news for you.  I think it is appropriate.  I think it's the right thing.  I think it accomplishes justice in every --

THE DEFENDANT:  Your Honor, can I say something?

THE COURT:  Sure.

THE DEFENDANT:  I really apologize for everything, your Honor.  I never did anything, and it was not my intentions.

I was suicidal after my friend committed suicide, and I wanted to end my life.  I never wanted to do anything like this.  I never had any intentions

to do like this.  Please reconsider --

(Indiscernible)

THE COURT:  Mr. Sachdeva, I'm not going to reconsider.  If that's a formal request, I'm going to deny it; but let me say this, Mr. Sachdeva.  I tell everyone this.  We are all better people than the worst thing that we've done.  Clearly you have the ability and the talent to be a better person.

THE DEFENDANT:  Your Honor, I was doing the best thing --

THE COURT:  Hold on, sir.  It's my turn now. You clearly did something wrong.  You did something seriously wrong that requires the sentence that I imposed.  I believe that in my heart, and I don't second guess that at all.

I do, however, believe that when you get out and you get home, you have the ability to build the life that you believe --

THE DEFENDANT:  I lost my life.  My mother and my wife will leave me.  My sister will die.  Thank you.

THE COURT:  Well, I hope that doesn't happen to you.  We're going to stand adjourned.  Thank you, everybody.

(Adjourned)

C E R T I F I C A T I O N


          I, Karen M. Wischnowsky, RPR-RMR-CRR, do

hereby certify that the foregoing pages are a true and

accurate transcription of my stenographic notes in the

above-entitled case.


          February 10, 2021_____

          Date


          /s/ Karen M. Wischnowsky_____

          Karen M. Wischnowsky, RPR-RMR-CRR
          Federal Official Court Reporter